**WALTER N. YODER & SONS, INC.**

v.

**SHEET METAL WORKERS' LOCAL UNION NO. 100.**

Civ. No. Y–86–772.

United States District Court,
D. Maryland.

June 9, 1987.

Paul M. Lusky, Towson, Md., for plaintiff.

Richard M. Resnick, Washington, D.C., and Bruce J. Lipstein, Clinton, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Plaintiff Walter N. Yoder & Sons, Inc. ("Yoder") instituted this action to vacate an arbitration award entered in favor of Sheet Metal Workers' Local Union No. 100 ("Local 100" or "the Union"). The Union counterclaimed, seeking enforcement of the arbitration award. Both parties have filed motions for summary judgment. For the reasons discussed below, resolution of these motions is stayed pending remand to the arbitration panels for clarification of their decisions.

## I. FACTUAL BACKGROUND

Yoder is a construction firm engaged, in part, in plumbing and heating contracting. Local 100 is the collective bargaining representative of sheet metal workers employed by Yoder. On June 4, 1984, Local 100 notified Yoder of a grievance which charged that Yoder was violating their collective bargaining agreement by operating an "alter ego" company, Potomac Metal & Supply, Inc. ("Potomac"), within the jurisdiction of Local 100. The Union alleged that Potomac had been established by Yoder to circumvent the bargaining agreement. Drake Affidavit at 3, attached to Local 100's motion for summary judgment.

An alter ego company is also known as a "double-breasted" or "dual shop" operation. The National Labor Relations Board described a double-breasted operation as:

> ...one in which a contractor operates two companies, one unionized and the other nonunionized. Depending on how the companies are structured and operated, each may be a separate corporation or else both may be so interrelated that they constitute a single employer or one may be the alter ego of the other. A collective-bargaining contract signed by one of the companies would not bind the other if each were a separate corporation, but would bind the other if both constituted a single employer and the employees of both companies constitute a single appropriate bargaining unit or the nonsignatory company is an alter ego of the signatory company.

*Walter N. Yoder & Sons, Inc.*, 117 LRRM 1066, 1067 n. 2 (1984), *enforced sub nom.*, *Walter N. Yoder & Sons, Inc. v. NLRB*, 754 F.2d 531 (4th Cir.1985).[1] The collective bargaining agreement in effect between July 15, 1984 and April 30, 1986 explicitly prohibited "dual shop" operations:

### Dual Shops

The Employer agrees that no evasion of the terms, requirements and provisions of this Agreement will take place by the setting up of another business to do work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility hereunder.

Article 43 of the agreement between Local 100 and the Western Maryland Sheet Metal Contractors Association, attached as Exhibit A to Yoder's complaint.

Yoder responded to the Union's grievance notice by denying any violations of the collective bargaining agreement, whereupon the Union submitted a request

1. These decisions concerned a matter which arose earlier in this litigation. The Fourth Circuit upheld a National Labor Relations Board order commanding Yoder to cease and desist an unfair labor practice—to wit, withholding from Local 100 requested information necessary for the Union to enforce its collective bargaining agreement. Following the Fourth Circuit's decision, Yoder complied with the Union's request for information.

for a hearing before the Local Joint Adjustment Board ("LJAB"). The LJAB is an arbitration panel composed of an equal number of union and employer representatives. Drake Affidavit at 2. The Union's hearing request described the nature of its grievance as a dual shop operation, and it alleged that Yoder violated various provisions of three separate bargaining agreements in effect between May 1, 1980 and April 30, 1986. *See* Appendix 1 to Yoder's motion for summary judgment.

At the LJAB hearing held on September 11, 1984, Local 100 argued that Yoder and Potomac were alter egos, and that Yoder's dual shop operations violated Article 1 of the collective bargaining agreement. *See* Statement of Local 100 to the Local Joint Adjustment Board, attached as Exhibit 1 to Drake's Affidavit. Article 1, which contains what is known as the "recognition clause", provides as follows:

> SECTION 1. This Agreement covers the rates of pay and conditions of employment of all employees of the Employer engaged in, but not limited to, the (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof, and of all air-veyer systems and air-handling systems regardless of material used, including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (c) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches, and (e) all other work included in the jurisdictional claims of Sheet Metal Workers' International Agreement.

The Union argued that Yoder established Potomac to perform work covered by Article 1, that it failed to apply the terms of the collective bargaining agreement to Potomac employees, and therefore Yoder violated the bargaining agreement. To remedy the alleged violations, the Union contended that the LJAB should require Yoder to pay:

> 1) the equivalent of wages lost by employees as a result of the performance of work by Potomac into the apprenticeship training fund; and 2) to pay into the affected joint trust funds established under the agreement any delinquent contributions to such funds which have resulted from the violations. In addition, Yoder should be ordered to apply the terms and conditions of its agreement with Local 100 to Potomac.

Statement of Local 100 to the LJAB at 6.

After hearing argument from both sides, the LJAB could not reach a unanimous decision. In accordance with the deadlock provisions of Article 10 of the collective bargaining agreement, Local 100 appealed to a joint labor-management Panel, consisting of one representative appointed by the Sheet Metal Workers' International Association and one representative appointed by the Sheet Metal and Air Conditioning Contractors' National Association, Inc. Following a hearing, the Panel ruled on March 11, 1985 that Yoder had violated the collective bargaining agreement. The entire opinion reads as follows:

> The Chairman and Secretary met after the meeting and could not reach a final decision. Following a series of telephone discussions, it was agreed that Local 100 and Yoder Co. would meet to discuss possible ways of mutually agreeing to a contract settlement of a manufacturing and/or production type. After some 3–4 weeks, it appeared no solution was forthcoming. Accordingly, the panelists find for Local 100 and agree Yoder is in violation of his contract. No agreement was reached by the panelists as to the amount of monetary award (if any) is to be -assessed [sic] against Yoder and Local 100 maintains their right of appeal to the National Joint Adjustment Board under Article X, Section 4 concerning their request for assessed damages.

Exhibit 3 to Drake Affidavit. The decision neither made any factual findings as to how Yoder breached its agreement, nor specified which provision of which collec-

tive bargaining agreement had been violated.

Local 100 appealed the Panel's deadlock on damages to the National Joint Adjustment Board ("NJAB"), which held on August 15, 1984 that the panelists' decision that Yoder "had violated its collective bargaining agreement with the Local Union by its manner and method of operation of a wholly-owned company known as Potomac Metals" was "final, binding, and unreviewable by the NJAB." Exhibit 4 to Drake Affidavit. Because the evidence regarding damages was inadequately presented, the NJAB issued a subpoena directing that Yoder and Potomac make their books and records available for inspection.

Following a hearing on February 3, 1986, wherein Yoder continued to press its position that no evidence indicated that it had violated any aspect of its collective bargaining agreements with Local 100, the NJAB assessed $12,000 damages against Yoder. *See* Exhibit C to Yoder's complaint. On March 11, 1986, Yoder filed its complaint seeking vacation of the award rendered by the NJAB panel.

## II. DISCUSSION

Judicial review of an arbitrator's interpretation of a collective bargaining agreement is extremely limited. A federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation would be the better one. An arbitration award generally should be confirmed as long as it "draws its essence from the collective bargaining agreement." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596–97, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). However, an arbitrator's award that is repugnant to established law or public policy will not be enforced. *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983); *General Warehousemen & Helpers Local 767 v. Standard Brands, Inc.*, 579 F.2d 1282, 1292 and n. 8 (5th Cir.1978), *cert. dismissed*, 443 U.S. 913, 99 S.Ct. 3103, 61 L.Ed.2d 877 (1979). A collective bargaining agreement provision that violates federal labor law is unenforceable and void, and cannot form the basis for any arbitration award. *Perma-Line Corp. of America v. Sign Pictorial & Display Union*, 639 F.2d 890, 894–95 (2d Cir.1981).

Yoder contends that the arbitration panel's decision is based on an illegal contract provision and must be vacated. Yoder argues that the "dual shop clause" of Article 43 violates Section 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e), and therefore is unenforceable and cannot form the basis of the arbitration award. Section 8(e) makes it unlawful for a labor organization and an employer to enter into an agreement whereby the employer agrees not to do business with another employer or person.

In addition, Yoder argues that the arbitration award applied a union contractor's collective bargaining agreement to a non-union entity and its employees. This allegedly impinged on the National Labor Relations Board's authority under Section 9(b) of the NLRA, 29 U.S.C. § 159(b), to make bargaining unit determinations, as well as on Potomac employees' rights under Section 7 of the NLRA, 29 U.S.C. § 157, to decide whether they wish to unionize and to choose their own collective bargaining representatives. Moreover, enforcement of the arbitration award would purportedly force Yoder to violate Section 8(a)(1) of the NLRA, which prohibits an employer from interfering with employees' Section 7 rights, and Section 8(a)(2), which prohibits an employer from interfering with the formation or administration of any labor organization. 29 U.S.C. §§ 158(a)(1) and (2). In seeking automatic application of the Yoder contract to Potomac employees, the Union allegedly violated Section 8(b)(3), by refusing to bargain collectively with an employer, and Section 8(b)(1)(A), by restraining or coercing Potomac employees in the exercise of their Section 7 rights. 29 U.S.C. §§ 158(b)(3) and (b)(1)(A).

Local 100 counters by asserting that the arbitration panel's decision was based upon Article 1, not Article 43, of the collective bargaining agreement and, in any event, Article 43 is not illegal under the NLRA.

Moreover, the Union argues, the arbitration award did not apply Yoder's collective bargaining agreement to Potomac employees. It merely fined Yoder $12,000 for violating its agreement with the Union by diverting work to a non-union operation.

Neither the Panel decision finding Yoder liable, nor the NJAB decision setting damages, states any reasons for the conclusions reached. The panelists simply held, "[we] find for Local 100 and agree Yoder is in violation of his contract." Exhibit 3 to the Drake Affidavit. The NJAB summarily concluded, "After thoroughly reviewing the record and considering the oral presentation of the parties, the NJAB reached the following unanimous decision: The Employer, Walter N. Yoder & Sons, Inc., shall pay damages of Twelve Thousand Dollars ($12,000), payable within thirty (30) days of receipt of this order." Exhibit C to Yoder's complaint.

It is possible for this Court to determine whether the arbitration award, or the contractual provisions upon which it was based, violate federal law or public policy without knowing which provisions of which contracts were interpreted; what factual findings supported the conclusion of liability; how the damages were assessed; and whether the Yoder collective bargaining agreement was applied to Potomac employees and, if so, why. Accordingly, this case is remanded to the Panelists who adjudged liability, and the NJAB that determined damages, for written statements setting forth the factual predicate upon which their conclusions were based, and clarifying the meaning and effect of their decisions. *See Local 59, IBEW v. Green Corp.*, 725 F.2d 264, 266–67 (5th Cir.) (district court remanded to arbitration panel for clarification), *cert. denied*, 469 U.S. 833, 105 S.Ct. 124, 83 L.Ed.2d 66 (1984).

For the foregoing reasons, resolution of the cross-motions for summary judgment is stayed pending remand for clarification.

## ORDER

In accordance with the attached Memorandum, it is this 9th day of June, 1987, by the United States District Court for the District of Maryland, ORDERED:

1. That resolution of the parties' cross-motions for summary judgment be stayed pending remand to the arbitration panels;

2. That the Panelists who adjudged liability and the National Joint Adjustment Board members who determined damages file, within sixty (60) days, written statements setting forth the factual predicate upon which their conclusions were based and clarifying the meaning and intent of their decisions; and

3. That a copy of this Memorandum and Order be mailed to counsel.